The next case up this afternoon is Salvatore v. Tudor Brooks, II. For the appellant is Michael Pollard. For the aptly is James Wilder. Before we begin, I wanted to thank you, counsel. The court requests you to be here a half hour early, and you are. And we request that because every so often, and today is one of those days, our schedule is worked out so we can start earlier, and we can't do it without you. So I want to thank you for being here. But you get an equal number of points. Yeah. Because you're both. So, there you go. So, Mr. Pollard, you may proceed, sir. Thank you, Your Honor, and may it please the court. Counsel. My name is Michael Pollard, and I represent the appellant Cleaver Brooks in this case. This is an appeal from a friendly contempt order, and it is, frankly, the second time that the matter has appeared before this court. There was an argument in a Rule 23 decision issued in connection with an earlier stay order. And because there is a good deal of interconnection between the principal arguments advanced by the plaintiffs in this case with some of the things that were discussed in the stay order, I'd just like to point those out because I think it may allow us to cut through some of the arguments. For example, it suggested in its jurisdictional statement in this case that the court lacks appellate jurisdiction. I believe at page 18 of the court's Rule 23 order earlier, the court concluded that the requirements to make a contempt finding immediately appealable were satisfied in this case. So unless the court wants to go through the jurisdictional issue again, I'll move past that one. Second, the lead argument advanced by plaintiffs in support of their position in this case is that this was a frivolous appeal brought in bad faith. And I'll remind the court that at page 20 of that Rule 23 order, the court indicated, and I quote, We find plaintiffs have failed to demonstrate contrary to the trial court's finding that Cleaver Brooks' appeal was in bad faith and for the sole purpose of delaying trial. I think those are all law of the case. The court went on to note that Cleaver Brooks continues to rely on a leading Illinois authority, all asbestos litigation, and that it had mounted a substantial case on the merits, even though, of course, it left open the merits of the appeal for this case. And also in the Rule 23 order at page 5, the court indicated that with respect to the inspection that kind of pervades this case, that plaintiffs and counsel had made it clear that that inspection was in the Salvatore case only, which was briefed there, briefed again here. But I believe that also is clear from the earlier Rule 23 order that when the parties went up there, that inspection was in Salvatore. So, Mr. Pollard, it's always desirable, and I thank you for trying to eliminate issues that aren't really issues and cutting to the chase. And in that spirit, let me cut to the chase. I've been at this a long time as a trial judge in the bail court dealing with these kinds of issues, discovery issues, which this is. And I've never encountered a case like this or read about a case like this, and I will explain what I mean by that. I've encountered lots of cases where a party, adverse usually to plaintiffs, says, I want to obtain, I want to see these records, I want these records. And the other party, usually the defendant, says, no, you're not entitled to them, whatever, they're not relevant, they're not discoverable, and they're 219, whatever it might be. And we have sometimes litigation about that. I've never seen a case like this one before or heard of a case where what happened is the request to produce these documents was, in effect, granted. They're looking at 90,000 index cards, and when they've done that, they tell you, we want copies of these 5,000 index cards. And you say, no, we're going to give you copies of 13. Cutting to the chase, I don't understand how once you have turned over the 90,000 for their inspection, and without, maybe you weren't happy about it, the point is there was no litigation about it, it was done. You now come in and say, you know, we're not going to give you copies. Now, I read your brief. On page one, particularly your reply brief, there's persuasive contrary authority establishing that the production of documents for inspections does not waive a relevance objection to the further copying, production, and use of the documents so inspected. I underline that statement because, as I began my remarks, this is 41 years now in this judiciary. I've never seen such a case. And I was waiting to see what the persuasive contrary authority is, and I get to page 10, and I discover that the extent of the persuasive contrary authority is a federal district court in Texas that held it was, quote, not inclined to agree, unquote, that the production of, for inspection of documents is necessarily a waiver of any objection to the further production. That's not persuasive authority. The court looked, you know, I read appellate court lingo or court lingo, and when a judge says, I'm not inclined to agree, that's something short of an enthusiastic endorsement of the position you're arguing for. And I suppose the question is this. Having turned over for inspection, having produced, which is the language we're talking about here in the rule 219 in discovery, how do you then back off and say, yeah, you've seen it, but I'm not going to let you copy? How does that work? Well, it's not a backing off. I mean, we've asserted the objection from the get-go. As the rule 23 order itself reflected, we objected to relevance, both objection, both in a general objection and specific objection. Well, let me pause here. Maybe I wasn't clear. Is there any authority that once you've turned it over for inspection and it's been inspected to say, and we now want copies of some of what you turned over for inspection, that you still have any Illinois authority or other authority that says, oh, yeah, by the way, you looked at it, but we're not going to let you have it? There is no authority that supports counsel's position that that is a waiver. The authority that we cite is, understandably, federal district court authority. Why is it a matter of, because there's no authority at this point, as far as I'm concerned, why is it a matter of common sense and policy? Should we respect your position here that having turned over 90,000 documents, you're going to say that you can't copy these X number, 5,000 of them? Why? What's the sense of that? Because the inspection was always subject to relevance. You see, pausing right there, maybe I didn't make myself clear. My experience in all the cases I've read to this point say, if you've got a relevancy objection, you make it before you produce the documents. Before you turn the documents over to the other side, which is what we did. By the way, produce in that context is always meant for their observation, for them to see it. This was a protocol that was going to be conducted one way and ended up being conducted a different way. The scope of it was going to be originally, you know, it was hopeful that there was going to be a protocol where you could cut through all this and not do it on a case by case basis. And they said no. And they said no. So we said, okay, well, we will, first of all, it would never have gone forward had they not said this is limited to the Salvatore case. So you can go up and look at 90,000 records, but what you're going to tab is limited to the Salvatore case. Again, let me be more clear. This was not pursuant to a court order. This was not pursuant to a judge who said, you're right, Mr. Pollard, I'm going to let this stuff go, and your reservations, I understand them. You asked for limitations, they rejected it, and they said we want to see these documents, and you turned them over. By producing them, I mean you produced them for their inspection. And we expressly said at the January 12th, 2017 hearing, subject to the objections we've made, that's how it was. Well, if I'm the trial judge, that doesn't make any sense to me because I don't understand any precedent. If you've turned them over, you've turned them over. That isn't the basis of the trial court's ruling here at all, though. That's not the discretion she exercised whatsoever at all. That isn't anything that you can defer to on her part because she would never have entered a contempt order if she thought that. Well, I'm trying to figure out, leaving aside the trial courts really for a minute, I'm just trying to figure out the whole concept of producing items for inspection and then saying you can't copy them. What? If they're not relevant, you have to object before you produce them. So you review 5,000 instead of 90,000, and your relevancy review is limited that way? You said, Mr. Wilder, you're not entitled to this, and we're going to challenge it in front of the judge on the grounds you asserted, and we're going to have a judicial review. And, you know, I think part of what's interwoven here is that the man had an accelerated trial date, and a lot of stuff was going on, and to try and honor that, accelerate, or do all the stuff that you had to do, it was sort of, okay, let's assert these relevance objections later. And that wasn't objected to. Counsel said, we'll go up there, and it's limited to the Salvatore case alone. We said we would assert relevance objection. We said it every which way to Sunday. And the court, when the dispute finally ripened, said, well, what we need to do is do a voluntary contempt. A friendly contempt. And I know the court has an abuse of discretion standard. You know, I've been to lots of courts lots of times. What I think the court did here, after making the order, is she knew, because she invited it, in essence, this friendly contempt. That there's never been a dispute that they had all 13 of the records for the job sites in question. And she basically urged plaintiff's counsel to keep the accelerated trial date and go to trial with the records. And I think she thought that aspect of her case management. I want to take a big picture of you here. And correct me if my statement of it is not correct. I'm running. Unless we agree that there is some basis to conclude that a party can turn over, produce, for inspection, 90,000 records, and still maintain afterwards a relevancy objection, you have no case. Isn't that right? It would be to maintain because it was asserted before, asserted throughout, and asserted at the end. You've turned them over. Now, if there's an agreement that you reach, that agreement is something to be recognized. But their response was no. So you could either litigate it or turn them over, and you turned them over. Having turned them over. They were going to tab what was relevant. And what they said was going to be relevant is the Salvatore case. Let me make it clear. You've turned them over. Once you produce these documents, whatever they were going to do with it, as far as their further copying, I don't see how you have standing any longer to object to their being turned over on any basis. Well, then I think the court is going to really dissuade anybody from ever doing that. From ever doing what? Allowing an inspection of their documents. Well, actually, I think that's the current rule because if it weren't that way, we would have some litigation. No, I don't think so. People look at documents, and they tab them, and they say what's relevant. And if there's a fight about relevancy, you bring it before the court. Otherwise, no client is going to – Well, relevancy at trial is different from relevancy for discovery. I agree with that. Well, your objection for relevancy for discovery is before you turn them over for inspection. Right, right. I don't dispute that. Then what's this case about? And what the Illinois appellate court said is an asbestos litigation, sweeping discovery requests are an abuse of discretion. We are one of 42 defendants in this case. You rule that everybody gets statewide sales of 42. What the Supreme Court has already discussed is an elephantine mass of litigation. Imagine how that will play out if everybody got to turn over all their statewide records in every case. Which is why that – Was there an objection made in that case prior to it being – the order being entered? You see, I'm going back. By production – And there were many objections made here. The idea is you produce records. You've lost any claim that they can't look at them because you produced them to look at them. Now, the only question thereafter is, having looked at them, we want to make copies of these X numbers, some percentage of them, relatively small percentage of them. And you say, well, now we're objecting to relevancy grounds. But it seems to me – and this is the threshold issue. Having produced them, I don't understand how you have any relevancy objection left. You could have made that objection, as in the oil asbestos case, before they were turned over. But you turned them over. You've lost – No, they made the general objection about – yeah, they objected before. We haven't turned over the documents is the point. We made them available for inspection. You see, that's the semantic point. You say you haven't turned them over. My point is, and there's no case that seems otherwise, when you produce them for inspection, you've turned them over. I don't think that's a fair reason. Why should we so hold? Why should we allow for this kind of parsing of terminology? If I were the plaintiff's lawyer in this case, I would think, okay, here are the documents. And, by the way, we'll tell you we're not asking for all 90,000. We'll tell you which ones we want. And here we want these 5,000. But you've lost – Because that makes the – You've lost the objection to production because you produced them. That makes the requesting party the sole determiner of what is relevant. No, you could object before producing. Which we did. We objected to anything that is not relevant. And they said no. They said no, but we'll agree to go only in Salvatore, not in this all-encompassing litigation. And these documents are patently immaterial. We pointed that out to the court with respect to – irrelevant, rather, and not likely to lead to – The court wasn't involved in making any rulings before you produced these documents, was it? No, not on the relevance issue. On any issue? On a protective order trade secret. Well, okay, it's – But, you know, we turned these 90,000 documents over for inspection. And the judges, you know, that's between you and counsel. And if you don't want to turn them over, say judge, Walter's wrong, these aren't relevant, he is not entitled to them, and then we get litigation. Well, I do think you'd be making very unsound public policy. Because in those circumstances, such as, for example, mass tort litigation, where parties are able to maybe come to a multi-case agreement on inspection protocols, et cetera, your ruling would dissuade that. No sound defendant representing their client's interests would ever agree to that. You raised, within weeks of their inspection, all of these relevancy objections, did you not? We raised general and specific objections to anything – No, when they came up with the, we want these 5,000. Oh, absolutely. That was within weeks, right? Yes. Why couldn't – assuming there's merit to your relevancy objections, why didn't you raise them – why couldn't you have raised them before you produced the documents? We haven't produced the documents. Counsel, as far as I'm concerned, when you make them available for inspection, you produce them. You made them available for inspection. The same relevancy objections you made a few weeks later, if they were so compelling and relevant at that time, why didn't you raise them to the trial court for a ruling before you turned the documents over for inspection? Because we had no idea what they would tab. We thought we were going to go on a protocol that addressed multiple cases, not just this one. And then as it developed like a day or days before the scheduled inspection, the whole deal was off. And that's when counsel said, okay, we're still going up there, but we're limiting it to the Salvatore case. It was an entirely different inspection at the start. Well, if you're telling me that you had an agreement that it was going to be limited, then that's something which the court could have understood and resolved, but that's not the argument you made. The parties under an accelerated trial schedule were working – were attempting to agree. The agreement didn't go forward. And we envisioned it one way. They envisioned it another way. Never the twain met. And as a result – Well, if there are agreements, that could be litigated in front of the judge who could make a decision. I'm not saying there's an agreement. I'm saying that there was a proposal, and it ultimately did not come to an agreement. But now there's an inspection, and the thing that allowed it to go forward is we will do it only in Salvatore. So we have no idea of these 90,000 documents, how many they're going to tab. Mr. Powlett, I've taken much, if not almost all, of your time. Your time is up, but in the discretion I have, I'm going to let you continue with your argument because I want to hear what else you might want to have said, plus as part of your reward, and Mr. Rauder's for being here early. So with that, I'll give you another 10 minutes. Go ahead and make the argument. I mean, I think unless – I mean, I don't think there is any dispute that they have all the documents that related to the job site Mr. Salvatore worked at. These records are for different time periods, other job sites. They admit that they are all the sales they saw in Illinois. Part of the reason expressed was they wanted to be able to show them to other counsel if necessary. And so in the absence of any Illinois authority prior to my client embarking on this inspection protocol and given the limited amount of authority, but which is to my client's effect, my client's advantage by federal district courts who write and consider about discovery disputes much more than appellate justices get the opportunity to do. I think that authority is persuasive, that there is no waiver, and I believe the court should reverse the – it certainly should reverse the contempt order. It's an appeal brought in good faith as the trial court noted, but I think it should reverse the order-compelling production of these records as well. And if you don't mind, I'll take whatever additional time you'll give me. Well, you have rebuttal time in any event. But I want to make sure, and I apologize, I don't think – No, unless Justice Appelman or Justice Connacht have questions, I'm – You'll get an opportunity to address this again. Okay, Mr. Wilder? Good afternoon, Jim Wilder for the Salvatore family. We're asking you to affirm Judge Foley. I want to go to a couple things. One, he brought up no defendant in asbestos litigation would ever produce all their sales records. With all respect to Mr. Powell, he hasn't been doing asbestos litigation. He wasn't involved in any of this. They do it routinely. Honeywell has theirs all on a database. When you file a case, they give you the access for it, and you can go in and see. My staff and six people went to Texas twice to look at 300 boxes of AVEX documents because they gathered them all. My partner, Andy, and three people from my office are going to San Francisco to look at 90 boxes of Kelly-Moore invoices next week because they do it, and that way you don't go back over and over again for expense for them and expense for us. Now, as far as the idea that this was all – so that's – when he says nobody do it, he ought to tell the people who are practicing asbestos because they do it routinely. They gather their documents. Owens, Illinois, they've got a collection of all their asbestos documents in Toledo. And you go there. I went there twice in 25 years because some stuff came up I wanted to go back, but I've only been there twice. You don't do it over and over. One thing he said was on the Rule 23 order, page 5, paragraph 12, there was a statement that plaintiff's counsel indicated he would never agree to a one-time inspection but made it clear he would review only those index cards relating to Salvatore. With all respect, that's wrong, and I even know how you got to the wrong place. The attorney I was dealing with, my partner Lisa Corwin was dealing with, was Bill Swallow. He's no longer with the firm. Swallow agreed to produce the stuff on behalf of Cleaver Brooks, 90,000 cards, which was specifically what we were asking for. And then on January 10th, they were going to produce them. January 4th, we get this protocol about how you can't take notes of what you've seen. You've got to agree it's trade secrets, confidential, all this stuff. And Swallow and I talked on the 9th, and I said I'd never agree to that for a variety of reasons. And his concern is we'd be there over and over. It was expensive to pull these 90,000 cards, the drawers they were in, put them in a conference room. And so they wanted to be in all pending and future cases my firm would have, and I said I'd never agree to that until a one-time inspection. As sure as I did, somebody would walk in the door a year later who said, I worked for 10 years in North Carolina with Cleaver Brooks Boilers before I moved to Bloomington to work in maintenance at State Farm. And I'd be stuck with the idea I had my one, quote, one-time inspection back in 2017. So we talked, and we talked that evening, January 9th. The letter from Swallow to me is in the record. It's in our opposition to exhibits in opposition to their motion to stay. And that can be found, the exhibits start at, I'll find it in a second, the site for the record where you can look at the letter. And the reason I'm getting at this is they started, it's the record 11790-11808. There's a bunch of letters. One of them is Swallow's letter to me on the 9th. My letter goes back to him on January 10th. My letter on January 10th says, you know, we're going to go, dealt with our production to them or they could come look at our stuff at our office. And I say the inspection will be in Salvatore only, comma, not in, quote, all WCK cases, end quote, because I was not going to agree to a one-time inspection. So my statement was it will be in Salvatore only, comma, not, quote, in all WCK cases. That doesn't say I'm not going to look at cards of my staff that relate to other cases, as paragraph 12 says. But the reason paragraph 12 probably says that is that in their statement of facts, page 7 in this appeal and in the last one, what they do is say plaintiff's intention that the inspection was for evidence related solely to Mr. Salvatore's case. Plaintiff's counsel stated in a letter that the inspection will be in Salvatore only, brackets, end quote, and not relating to any of the other pending cases plaintiff's law firm has against Cleaver Brooks. Mr. Browder, let me ask you, I don't, I think your point is a good one, but I don't think it's pertinent to what we're addressing here. Let me. I'll just say I wanted to because I think there's a mistake in the record and it's there because of the cheating statement of facts. Go ahead, Judge. With regard to your inspection of these documents, the 90,000 index cards, the first question you heard me pursue with Mr. Pollard was, was there some agreement, some contractual agreement, or whatever you want to call it, between the plaintiff and the defendant concerning how your inspection would be limited. They proposed some, you rejected it, and then it appears to me that Mr. Pollard, that's why his rebuttal, he had a chance to correct me if my impression was wrong, appears to me that what he was saying is, well, it's true that there was no agreement, but we nonetheless made these available with our understanding of how they were going to be limited. I don't think that's, frankly, compelling. Following up on that, was there any claim made before the trial court here that somehow there was some agreement or some limitation upon you that the parties had reached with regard to these 90,000 cards? No. No as to both, and I can cite you to, I think, something that supports my position. Okay. First, as I said, I talked with Swallow, and I get along with some people, and we're like, I'm not running up to Milwaukee over and over looking at 90,000 cards, but I'm not going to agree for all cases where we're going to do this. And there's references in the record that we tried to say, hey, we'll look and tap, but I'm not going to say for all future cases and everything. It wasn't limited only to Salvatore. They cheated on my statement. They took it out and put it in brackets. And that was January 10. And January 12, they had a motion, the trade secret motion, where they said just sales records are trade secrets, and they argued that in front of Judge Foley. And Swallow was there arguing for them, and at page 11 of that transcript on January 12, he says, because he knew what was going to go on, they're going to pull out of, even if they're pulling out of it, they're still pulling out large numbers of boilers, where we're at, what we sold there. He's not talking about pulling out 11 or 13 boilers. He knew what we were going to do, because, again, that way we wouldn't be their concern. We were going to run back up there over and over. He knows that January 12. Let me ask you, before you went up there to inspect these 90,000 carts. There was no agreement to limit them. That's my question. No. What agreement of any sort existed with regard to how you would use them? We would tab what we wanted. And, in fact, at page. . . For copying. For copying. The court says my assumption. . . But there was no. . . You were under no limitation by agreement on what you could see and what you'd say about. None whatsoever. Well, the reason I. . . and you've heard my discussion here. . . And I note in your brief, you wrote this. Cleaver Brooks has been unable to find the decision holding a party can produce documents in response to a request for production, not allow the opposing party to have a copy of what was produced and read by the party. That's in page 31 of your brief. And the only case they've come up with is this one about not inclined to agree, which is a rather mild endorsement. Is there, on the flip side of that, has there ever been any case saying, in fact, wait a minute, defendant, you've agreed to let the plaintiff inspect X number of documents, therefore you have lost your right thereafter to complain about looking at them again or making copies? I don't know that there is because, again, I've not. . . And I don't have. . . I've only got 39 years of doing this, but I've never had somebody say, here's the document, now you've seen it, but you can't get a copy of what you've seen go on your memory. Well, that's what strikes me as kind of peculiar here because I. . . And, you know, when you say there's not any law on this point, it's because it seems to me, frankly, self-evident that if they've been produced, then they've been produced. You've thought about it later, before trial, on a pretrial hearing, but you get what you get. The issue on discovery is not you're making copies of them, but you're seeing them. Right. I mean, isn't that typically what the issue is? Whether or not you get to see them. And if I can, as an example, going back to that January 12 hearing, regarding the trade sequence thing, they didn't argue relevance. They didn't argue limitation of Salvatore. Only Bill Swallow knew we were going to be pulling lots of boilers. He said that. Judge Foley said, it's my understanding, my assumption, they won't receive a copy of all 90,000. Is that true? They're going to go through and be marking those they want, and those will be copied? Correct, Your Honor. And then she says, anything else? He says, well, we'd like 304A language. And she says, I'll entertain a written motion. And they found no 304A. Instead, they produced the 90,000 documents. It's about restriction. And think about it. Also, I mean, we've got 1.8 people there. Other times, six. We're copying, you know, we're tabbing stuff. If they thought, and they've got two people watching this at all times, and their attorneys are in and out, time setting there also. And you could look at the first drawer, there are like six rows of these index cards, and say, well, geez, it looks like there's a lot more than 13 cards tabbed there. When we have the motion to continue hearing January 27th, their counsel says, we've sent them out to announce that the 5,000 to an outside copying firm, they'll be available today. Frankly, it appears to me that this is simply a case of, and I don't mean to be too critical from the defendants here, because this happened in this litigation. They changed their mind. They thought this was not a smart thing to have done. And after the fact, they decided to raise these relevancy objections. I suppose, you know, it's not on the record as such, but you've done this a long time. And maybe I'll ask your view, and then I'll ask Mr. Pollack's as well. My understanding of all the discovery issues I've ever seen in many decades is, the objection to discovery is raised before you, as the plaintiff, are given access to these documents to see them. That's true, and it's true. Has he ever before? Have you personally ever encountered a situation where you've been given access to documents, you've seen them, to your heart's delight, apparently, two days' worth, you say you want to have copies of some of them but not all of them, and you're told no? Never, and I would not. Have you ever heard of such a thing? No. No other defendant has done that, whether it be in asbestos or not asbestos. And from our side, you go through what you're going to produce ahead of time, and you hold out. And I've had people hold stuff out on privilege. I've had people hold stuff out, and we fought on it. And they don't show it to the other side. And the other side says, okay, can I get a copy? And then when you know they're going to be tabbing a lot of stuff, and then when you move to continue the trial, say, well, we've got them out, it's an outside copy shop. They don't need an outside copy shop for 13 pages of documents. They'll be available today. And then when we follow up and say, where are the cards, say, well, we've decided now you only get the 13. Maybe change the rules a bit, Mr. Wilder, because, well, it's true, most discovery issues involve plaintiffs asking for discovery from defendants who they don't want to turn over. Occasionally it's the other way around. In this case, my letter January 10th, they wanted to seize documents, all documents we had in our office, and I, a paralegal, went through all of them ahead of time of what we were going to produce. And there's a couple we held out and we didn't produce them. And then Bill Swallow looked at them after Larry's death on January 16th. Well, so if you're asked to produce documents by the defendant, maybe a prior medical history of a plaintiff or something else of that kind that you think is inappropriate, you raise relevancy objections before turning them over, don't you? Raise whatever objection you think exculpates you from turning them over. You don't turn them over and do it after the fact. Well, that's what I'm wondering about. That's how I began this whole discussion. It seems to me that's the threshold inquiry here, and I've never heard of a situation where you turn them over, and by turn them over that means if you produce them for inspection, you turn them over, and then after the fact object on relevancy grounds. And so you can't get what you've looked at. I've never encountered before. It's, you know, that's, I thought on the way down, but I've restrained. I mean, this is all about making copies, going back to Saturday Night Live, and this is, I've never had this come up. Yeah, you're making copies. And even if you got the copies, they could fight later and say you can't use them. Well, of course, we're under a different issue entirely in relevancy for trial purposes, just in a discovery context. But having given you access, I don't understand the notion that you're no longer entitled to make copies of stuff you've seen. It would seem like the copies would be a starting point to then have the fight if there was going to be one, but if you thought I should never see them, they should never have been in the room. They should have said we're producing only this number of cards that we believe are relevant. And what was it, just six weeks later, that they raised relevancy arguments? It was more like four, Judge, because we saw them in the back. More like four. But the reason I mention that is there's no suggestion in this record that the relevancy arguments they made four weeks later weren't available, if they wanted to make them, before you conducted the inspection. They've done before a couple things. In-ray asbestos, which they first cited deep into it, that's a case where it wasn't produced. They didn't produce them and then say, okay, Kooning Conway, you can't get copies. It wasn't produced, and it was more than sales records. It was to compel Warren Pumphs to produce invoices, records, specifications, bills of ladings, correspondence, publications, I could go on, and any other document on knowledge. But they weren't produced. And Warren Pumphs said it's impossible for us to do that. And also they had a specific order up there, as Judge Bolli referenced, in distinguishing that case, a case management order and a master discovery answering system in Cook County, and none of that was here. But secondly, they were never produced. Has there ever been a case where they were produced and then copies not made? They mention none in their appellant's brief, and they haven't mentioned it here yet today, but he gets to go last, just like in the briefing. And in their reply brief, they go, well, we found one. It's a Calvert case. And before I sit down and get ambushed from behind on that, the Calvert case is nothing like this case. The Calvert case is a federal case out of Texas. Subpoena gets served on a third party, I mean, yeah, a non-party. Non-party under 45D1 does not have to go through the trouble of finding what's responsive to the subpoena, but just can say the records are in these file drawers, along with other stuff, go through. So the guy goes through and he finds records that relate to the 27 things in the subpoena and sees some other stuff he'd sort of like. So he says, well, give me those two. And the district court judge says, you get all the stuff responsive to subpoena, but for the other stuff, you're going to have to go back and serve another subpoena. The problem was the plaintiff's attorney had blown the discovery deadline, so that was why he wanted them. You make this argument well in your brief about how, wait a minute, he's produced the items already. How can he argue relevancy to a copy? Did you make that argument to the trial court? Say, judge, this is kind of crazy. You've already seen the arguments, or seen the documents. That was just a copy of those 5,000 of the 90 we've seen. What's the issue? February 9, we made the argument. Judge Foley deemed that they were relevant. He talks about what Judge Foley thought. Look at her comments. It goes for four pages saying, I think these things are relevant.  I'm ordering them produced. Well, what's interesting is I don't, you see, maybe I'm not making this clear. It seems to me that the trial court at that point need not make any rulings whether they're relevant or not. The answer should be, is that right, Mr. Powler? Mr. Wilder has already been given access to these and seen them? Yes? Okay. Would have been a shorter ruling. Turn them over. Relevancy objection had to be made before he seen them. But Judge Foley, at any rate, when it was made, she turned them down February 9. They said, we're not going to comply. She gave them a deadline to February 20. They said, we're not going to do it. And so they said, can we have friendly contempt? And so she ordered a friendly contempt on that so they could take an appeal. But so, as to the jurisdictional stuff, I think it probably is law of the case. As to page 5, I think the court, whoever drafted the initial item on that, got misled by how they cheated on page 7 in the brief of changing my words to something different. And that's belied by the fact that their own counsel two days later says they're going to be tabbing lots of boilers. You know, and we don't want them tabbing lots of boilers. I've never, we get the copies. Now, what we can do with the copies, they can file motions, whatever, you know, about them. But we get the copies, and any one of those copies, any one of those index cards, I may not have the skills, but my partners would have the skills to have a line of inquiry with their corporate rep, which is why on January 27, the same trial counsel that says they're out to an outside agency said, I'm not saying all, and I was arguing that day, I'm not saying all the questions he suggested about them wouldn't be things he could ask my corporate rep. It's just going to take us time to have my corporate rep look through all this stuff. And we need to move the trial for that and other reasons. So all we want, and I'm not trying to be sarcastic, all we want is the copies. The contempt, I could care less about the $1. I mean, I subscribe to the Beeler case. Well, the trial judge made the determination that this is a good faith effort. I think we'd be very disinclined to be second-guessing that determination. You say it isn't, but that's what you say. I understand. I'm just saying, but it's the penalty, and if you say, well, we're not going to say, you know, they should be held in contempt, if that's a black mark on the counsel's record, I don't care. What I want are the 5,077 copies. As you said, you'd be disinclined to second-guess the trial judge. I suggest, hopefully, you'd be disinclined under the standard of abuse of discretion, the most deferential standard there is, to disincline to second-guess the way the court ruled on these things. In fact, it sounds like you're saying it would have been quicker if you'd been there. The court on February 9th would have said, relevance is done. You've already let Wilder, Corley, and Kelly see them, give them the copies. Or relevance isn't relevant. There's no questions. I'll stop. Thank you. Thank you, counsel. Mr. Fowler, rebuttal, sir. Certainly, I would like to go through a little detailed recitation here about the objections actually that were made. As the court indicated in the Rule 23 order, there was a general objection that the requests were not limited in time and scope to the particular facts of the case. Specifically, with respect to this request, it was objected to that it was neither relevant nor likely to discover admissible evidence. In the letter prior to the inspection protocol, we asserted, should there be any disputes over relevance, those disputes shall be addressed at the 1K conference prior to production. At the January 12th, 2017 hearing, we said we'll make the documents available for inspection, subject to the objections that we have made. Plaintiff's counsel said they will have their counsel look at those and say whether they should be protected or not. So at that hearing, there is some statement from plaintiff's counsel that there's an understanding that in the inspection, they should look at those and that my client's trial counsel will look at those and say whether they should be protected. So I think this is not a work of art in this case. I'm not saying it is. But I think there is enough in this record to suggest that we protected our rights to produce these subject to a second go-round over a relevancy determination. So you made them available for inspection, but not for TAP? Subject to asserting relevancy determinations. Subject to litigating relevancy objections later, yes, depending upon what was TAP. But you made them all available for inspection? Yeah, I don't deny that. So if there is, in fact, no distinction under the law that should be recognized for making them available for inspection in one hand and copying in the other, then you have no case. And I think you would be the first court in Illinois to say that. Well, I think that we may be because this is the first time in Illinois I've heard the distinction being made. I'll also point out that while some people make their documents available in asbestos litigation, others don't. You saw the whole litany of cases we cited in the opening brief about how other states determine relevancy determinations. Aren't those cases where there were objections made before? I'm not saying there are, but I'm saying that that's the scope of relevancy in this case. Well, you see, the problem, counsel, is it may be that some of your relevancy objections might have had merit in the eyes of the trial court, and if not there, maybe in the eyes of this court. But when you've turned them over, you've lost standing to raise those objections. Well, if this court were going to be the first court in Illinois to say that, then I think you should make the ruling prospectible. Because it wasn't, there isn't anything that basically the give and take here, while it's not crystal clear, I interpret counsel's statement about the inspection is in Salvatore only to mean we're going to tab documents in Salvatore only. That's not how we interpret it. But even if that were the case, you turned over everything else. I get it, but there was no contrary Illinois authority at the time saying not to do that. Certainly none that anybody's identified here today. And so given that, I think it was a good faith basis to assert a relevancy objection when and in the manner that we did. And I think that it's very clear that under the all asbestos case that that should rule the day and the relevancy determination should be reversed. And like I said, if the court is going to issue a case of first impression, I would ask the court to make it prospective only because I don't think we acted in derogation of established law. Thank you, counsel. And again, I apologize for taking up so much of your time, Mr. Fowler. Mr. Veralde, I appreciate the fact that you were here early and you gave us good arguments. Thank you.